AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 10-26-18)

FILED    ENTERED
LODGED    RECEIVED

NOV 14 2019

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                              DEPUTY

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

In the Matter of the Search of                )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.   MJ 19 - 553
                                               )
A Silver Mazda bearing Washington License Plate: BQN5917, as more  )
fully described in Attachment A.                )
                                               )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
   A Silver Mazda bearing Washington License Plate: BQN5917, as more fully described in Attachment A, incorporated herein by reference.

located in the _____Western_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
   ☑ evidence of a crime;
   ☑ contraband, fruits of crime, or other items illegally possessed;
   ☑ property designed for use, intended for use, or used in committing a crime;
   ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a) & 846 | Distribution to Distribute Controlled Substances and Conspiracy to Distribute Controlled Substances |
| 21 U.S.C. § 952(a) | Importation of Controlled Substances |
| 18 U.S.C. § 1956 | Money Laundering nad Conspiracy to Launder Money |

The application is based on these facts:
   ✓   See Affidavit of DEA SA Kevin Palermo, continued on the attached sheet.

   ☑ Delayed notice of _____ days (give exact ending date if more than 30 days: __01/29/2020__ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☐ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

Kevin Palermo, Special Agent
*Printed name and title*

⦿ The foregoing affidavit was sworn to before me and signed in my presence, or
◯ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: __11/14/19__                    _____
                                      *Judge's signature*

City and state:  Seattle, Washington          John L. Weinberg, United States Magistrate Judge
                                               *Printed name and title*

## Attachment A
## Property to be Searched

The property to be searched includes all areas at that location where the Items to Be Seized, listed in Attachment B, could be found, this includes all areas of the vehicle, all compartments, and all containers within that vehicle, whether locked or not.

**Target Vehicle** to be searched is a **Silver Mazda 3** bearing Washington License Plate: BQN5917. According to Washington Department of Licensing (DOL), this vehicle bears Vehicle Identification number (VIN) JM1BL1VG9C1507151 and is registered to Robert D Rennie at 7021 NE 181st St. Unit 12, Kenmore, Washington, 98028-2736.

ATTACHMENT A
USAO 2019R0019 - 1

**AFFIDAVIT OF Kevin Palermo**

STATE OF WASHINGTON )
                     )  ss
COUNTY OF KING       )

I, Kevin Palermo, a Special Agent with the Drug Enforcement Administration, Seattle, Washington, having been duly sworn, state as follows:

**AFFIANT BACKGROUND**

1.      I am employed as a Special Agent (SA) with DEA, and have been so employed since August 2016.  I am currently assigned to the Seattle Field Division, and as such I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 21, United States Code, Section 801, et seq. and Title 18, United States Code, Section 2516(1).  I received specialized training in the enforcement and investigation of the Controlled Substance Act.  I received over 620 hours of classroom training including, but not limited to, drug identification, drug interdiction, detection, money laundering techniques and schemes, smuggling, and the investigation of individuals and/or organizations involved in the illegal possession, possession for sale, sales, importation, smuggling, cultivation, manufacturing, and illicit trafficking of controlled substances.  Prior to becoming a Special Agent with DEA, I was employed as a police officer in the Village of Lincolnshire in Lake County, Illinois, from December 2014 to August 2016.  In that capacity, I was responsible for providing and promoting public safety in the Village of Lincolnshire and the State of Illinois by maintaining order, responding to emergencies, protecting people and property, and enforcing criminal and motor vehicle laws.  During this time, I was involved in investigations of criminal offenses including, but not limited to, narcotics, identity theft, burglary, fraud, DUI, theft, and domestic violence.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1    2.    In my role as a DEA Special Agent, I participated in narcotics
2    investigations involving heroin, cocaine, marijuana, fentanyl, and methamphetamine,
3    which resulted in the arrest of individuals and the seizure of illicit narcotics and/or
4    narcotic related evidence and the forfeiture of narcotics related assets.  Based on my
5    training and experience, I have become familiar with various tools, methods, trends,
6    paraphernalia and related articles utilized by various traffickers in their efforts to import,
7    conceal, and distribute controlled substances.  I am also familiar with the various
8    methods of packaging, delivering, transferring, and laundering drug proceeds.
9    Additionally, through my training and experience, I can identify illegal drugs by sight,
10   odor, and texture.

11    3.    I have also worked on drug investigations involving the use of court-
12   authorized wiretaps under Title III.  In that capacity, I have monitored, listened to, and
13   reviewed transcripts and line sheets both in English and Spanish (prepared by linguists)
14   documenting the content of hundreds of intercepted conversations involving the
15   trafficking of cocaine, methamphetamine, heroin, and other narcotics, by persons who
16   used some form of code to thwart law enforcement.  I have also interviewed defendants at
17   the time of their arrest and debriefed, spoken with, and/or interviewed numerous drug
18   dealers or confidential sources (informants) at proffer and safety valve interviews who
19   were experienced in speaking in coded conversations.  In many of these interviews and
20   debriefings, I was able to speak with these drug traffickers about specific conversations in
21   which they were intercepted pursuant to electronic surveillance.  From these interviews,
22   and also from discussions with other experienced agents, I gained knowledge regarding
23   the various methods, techniques, codes, and/or jargon used by drug traffickers in the
24   course of their criminal activities, including their use of firearms to protect their narcotics
25   related activities, cellular telephones, and other electronic means to facilitate
26   communications while avoiding law enforcement scrutiny.

27
28

AFFIDAVIT OF KEVIN PALERMO - 2
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## PURPOSE OF THIS AFFIDAVIT

4.     This affidavit seeks authorization to search:

     a.     **A Silver Mazda 3 (hereinafter silver Mazda)** bearing Washington License Plate: BQN5917. According to Washington Department of Licensing (DOL), this vehicle bears Vehicle Identification number (VIN) JM1BL1VG9C1507151 and is registered to Robert D Rennie at 7021 NE 181st St. Unit 12, Kenmore, Washington, 98028-2736.

5.     The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. I have not included every fact concerning this investigation. Rather, I have set forth the facts that I believe are necessary for a fair determination of probable cause.

## SUMMARY OF PROBABLE CAUSE

### Jimenez-Hernandez Trans-National Criminal Organization

6.     Beginning in December 2018, DEA, Snohomish Regional Drug Task Force (SRDTF), Skagit County Drug Task Force (SCDTF), and Seattle Police Department Narcotics (SPD) began investigating a drug trafficking organization (DTO) operating within the Western District of Washington.  Through the use of confidential source information and traditional investigative techniques, agents[1] identified several individuals, including Christian JIMENEZ-HERNANDEZ, Martin Esteban QUINONEZ-LUQUE, Gonzalo VILLASENOR, Jocelyn LEYVA-CASTELLANOS, and Julio Cesar RAMIREZ-MENESES, involved in the distribution of methamphetamine, heroin, and counterfeit oxycodone, commonly referred to as M30s.

### Authorization to Intercept Wire and Electronic Communications

7.     On October 15, 2019, the Honorable James L. Robart, United States District Judge for the Western District of Washington, signed an Order authorizing

---

[1] When I use the term "agents. throughout the affidavit I am referring to law enforcement personnel, to include, but not limited to DEA and FBI agents and task force officers; Seattle Police Department sergeants, detectives and officers; and Snohomish Regional Drug and Gang Task Force detectives, etc.

AFFIDAVIT OF KEVIN PALERMO - 3
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  interception of wire and electronic communications of 425-345-8051 ("TT3") used by

2  Gonzalo VILLASENOR, 425-410-6962 ("TT4") used by Gonzalo VILLASENOR, and

3  206-578-9119 ("TT6") used by Julio Cesar RAMIREZ-MENESES.  In doing so, Judge

4  Robart found probable cause to believe that TT3, TT4, and TT6 were being used to

5  further drug trafficking and related offenses.  Interception pursuant to that order began

6  that day and ended on midnight of November 14, 2019.  Intercepted calls have

7  strengthened investigators' belief that VILLASENOR, RAMIREZ-MENESES, and their

8  associates are distributing narcotics in the Western Washington area.

9         8.     On October 21, 2019, the Honorable Mary Alice Theiler, United States

10  Magistrate Judge for the Western District of Washington, signed an order authorizing

11  real-time GPS tracking and court authorization for the installation and monitoring of a

12  pen register and trap and trace device for three target telephones, TT11[2] (360-202-5932),

13  TT12 (206-661-7401), and TT13 (425-528-4845).

14         9.     On October 22, 2019, the Honorable Mary Alice Theiler, United States

15  Magistrate Judge for the Western District of Washington, signed an order authorizing

16  real-time GPS tracking and court authorization for the installation and monitoring of a

17  pen register and trap and trace device for three target telephones, TT7 (425-443-4979),

18  TT10 (206-574-8656), and TT14 (360-722-2984).

19        10.    On October 29, 2019, the Honorable Mary Alice Theiler, United States

20  Magistrate Judge for the Western District of Washington, signed an order authorizing

21  real-time GPS tracking and court authorization for the installation and monitoring of a

22  pen register and trap and trace device for three target telephones, TT15 (425-948-9793),

23  TT16 (541-730-0001), and TT17 (206-460-9015).

24        11.    On October 31, 2019, the Honorable Paula McCandlis, United States

25  Magistrate Judge for the Western District of Washington, signed an order authorizing

26  

27  [2] On October 24, 2019, the phone provider for TT11 advised agents that the phone number of 360-202-5932
changed to 206-669-4690 but the IMSI for the phone device remained the same; therefore, agents were able to

28  continue receiving GPS tracking and pen register and trap and trace data on TT11 under the existing court order.

AFFIDAVIT OF KEVIN PALERMO - 4
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  real-time GPS tracking and court authorization for the installation and monitoring of a

2  pen register and trap and trace device for three target telephones, TT18 (325-921-0597),

3  TT19 (206-581-5661), and TT20 (425-791-6612).

4      12.    On November 6, 2019, the Honorable Michelle Peterson, United States

5  Magistrate Judge for the Western District of Washington, signed an order authorizing

6  real-time GPS tracking and court authorization for the installation and monitoring of a

7  pen register and trap and trace device for three target telephones, TT21 (425-499-5560),

8  TT22 (206-929-8323), and TT23, (206-353-2038).

9      13.    I know through training and experience, including experience with this

10  investigation and my discussions with other experienced officers and agents involved in

11  drug investigations, that individuals involved in the distribution of controlled substances

12  and other criminal activity often use coded words and inferences when referring to their

13  illegal activity. I have used this training and experience, as well as the training and

14  experience of other law enforcement officers familiar with this investigation, to substitute

15  what I believe to be an accurate translation for these coded words and inferences which

16  are included in parentheses in this affidavit. The following summaries are based on my

17  review of the line sheets of intercepted communications, and from my discussions with

18  other law enforcement officers familiar with this investigation who have reviewed the

19  line sheets. Although these line sheets provide an accurate summary of the intercepted

20  communications, they are not necessarily the final transcripts of the intercepted

21  communications. The paragraphs herein include the summaries of pertinent portions of

22  intercepted calls, and are not necessarily the entire conversations between the parties

23  involved. Based on my training and experience, and the training and experience of other

24  agents, in summarizing these calls in this affidavit I have included my understanding of

25  certain coded language in brackets.

26  //

27  //

28  //

AFFIDAVIT OF KEVIN PALERMO - 5
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**Probable Cause as to Silver Mazda**

Previous communications and controlled purchases with RAMIREZ-MENESES

14.     During this investigation RAMIREZ-MENESES is believed to be the user of 253-981-2156, 425-532-2163 (TT1), 206-487-9828 (TT2), 253-433-1728 (TT5) and 253-433-1728, 206-578-9119 (TT6).  Law enforcement used the assistance of CS1 and conducted five controlled purchases of narcotics from RAMIREZ-MENESES using TT1.  Subsequent to these controlled purchases, RAMIREZ-MENESES obtained new telephone numbers, which were provided to CS1.  RAMIREZ-MENESES continued to discuss drug trafficking activity with CS1 using TT2, TT5, and TT6.

May 4, 2019 Controlled Purchase from RAMIREZ-MENESES using TT1

15.     On May 4, 2019, agents met CS1[3] and instructed her/him to contact RAMIREZ-MENESES and attempt to arrange a purchase of 25 grams of heroin.  Prior to meeting with agents, CS1 received text messages from RAMIREZ-MENESES.  CS1 reported, in summary, that RAMIREZ-MENESES said CS1's order arrived, and CS1 should tell RAMIREZ-MENESES where to meet.  At the direction of agents, CS1 texted RAMIREZ-MENESES to meet him/her near the Bank of America at Northgate Mall at 2:30 p.m. that day.  RAMIREZ-MENESES responded that he was ready.  Agents established surveillance in the area of the Bank of America at Northgate Mall in preparation for the deal.

16.     Agents searched CS1 and her/his vehicle for narcotics, paraphernalia, currency and weapons.  CS1 had personal currency, which was counted and secured in agents' undercover vehicle.  CS1 and her/his vehicle were otherwise free from the listed

---

[3] CS1 was previously arrested on a state narcotics violation and is cooperating with agents under an active cooperation agreement with the Seattle Police Department in exchange for charging considerations. CS1 has provided reliable and accurate information on numerous crimes and criminal activity that have been verified by agents.  In addition to the more recent narcotics arrest, CS1 has two felony convictions for drug related offenses. CS1 also has misdemeanor convictions for obstructing a law enforcement officer, reckless burning, disorderly conduct, reckless driving, and possession of burglary tools. CS1 admitted to agents that he/she sold narcotics in the past, and described how such drugs were packaged and distributed.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  items.  Agents gave CS1 pre-recorded buy money for the controlled buy, and followed
2  CS1 to the meeting location.

3       17.    CS1 informed agents at approximately 2:20 p.m. that RAMIREZ-
4  MENESES texted CS1 and said he was looking for the bank.  At approximately 2:22
5  p.m., agents observed the **silver Mazda** 3 with no license plate in the parking lot of Bank
6  of America.  Agents confirmed RAMIREZ-MENESES was the diver of the **silver**
7  **Mazda** based on observing RAMIREZ-MENESES on previous operations.  At
8  approximately 2:26 p.m., RAMIREZ-MENESES repositioned the **silver Mazda** next to
9  CS1's vehicle.  Agents observed RAMIREZ-MENESES exit the **silver Mazda** and
10  access the trunk.  Agents observed that RAMIREZ-MENESES held a white plastic bag
11  that appeared to have a box inside it.  RAMIREZ-MENESES entered CS1's vehicle, and
12  CS1 moved his/her vehicle to a different area of the parking lot, as directed by agents.

13       18.    While CS1 and RAMIREZ-MENESES were in CS1's vehicle, agents were
14  able to photograph the VIN and temporary license plate of the **silver Mazda**.  Agents
15  identified the **silver Mazda**'s VIN as JTT3BL1VG9C1507151, and the temporary paper
16  plate as E9693510.  A DOL inquiry showed the VIN was registered to G&S Auto Sales
17  Inc. in Tacoma, Washington.

18       19.    Shortly thereafter, RAMIREZ-MENESES and CS1 returned to the **silver**
19  **Mazda**.  Agents observed RAMIREZ-MENESES exit CS1's vehicle, and access the
20  trunk of the **silver Mazda** a second time.  Agents observed RAMIREZ-MENESES place
21  a white USPS/FedEx or similar box into the trunk.  RAMIREZ-MENESES then accessed
22  the front passenger side of the **silver Mazda** and removed a small item, placed it in his
23  pocket and returned to CS1's vehicle.  CS1 moved his/her vehicle to a different area of
24  the parking lot again as directed by agents.  After a short period, CS1's vehicle returned
25  to the **silver Mazda**.  Agents observed RAMIREZ-MENESES entered the **silver Mazda**
26  and departed the area.

27

28

AFFIDAVIT OF KEVIN PALERMO - 7
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

20. Agents followed CS1 to a pre-determined location where CS1 provided agents with a box containing suspected heroin. Agents searched CS1's vehicle and person for narcotics, paraphernalia, weapons and currency, and found none.

21. In summary, CS1 informed agents that RAMIREZ-MENESES entered his/her vehicle carrying a white postal box. RAMIREZ-MENESES showed CS1 four cylindrical objects, believed to be one (1) kilogram each, of heroin inside the box. RAMIREZ-MENESES unwrapped one of the suspected kilograms of heroin to obtain a sample of heroin for CS1. While RAMIREZ-MENESES was unwrapping the kilogram, CS1 observed it was wrapped in what he believed to be cellophane, grease, foil, x-ray paper, and petroleum jelly.[4] Once RAMIREZ-MENESES finished showing the kilograms to CS1, the pair returned to RAMIREZ-MENESES' vehicle so RAMIREZ-MENESES could obtain a scale from the **silver Mazda**. RAMIREZ-MENESES then broke off a piece of the heroin and weighed it for CS1. CS1 and RAMIREZ-MENESES exchanged the sample for the buy funds and then left the area.

September 8, 2019, Transfer of Communication from TT5 to **TT6**

22. On September 8, 2019, CS1 received a text message from 253-433-1728 (TT5), used by RAMIREZ-MENESES. A Spanish-speaking interpreter contracted by the DEA translated the following text:

TT5: I am going to call you from another number

23. Immediately after receiving the text message from TT5, CS1 received a telephone call from 206-578-9119 (**TT6**) which CS1 did not answer. CS1 texted TT5 and the following communication occurred:

CS1: Who's this?

CS1: Cesar?

---

[4] I know, based on my training and experience, that wholesale amounts of heroin are often smuggled into the United States packaged in this fashion in the belief that it will defeat law enforcement detection by drug-detecting dogs and other methods.

AFFIDAVIT OF KEVIN PALERMO - 8
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1          TT5:  Yes

2      24.     Based on this exchange, agents believe that RAMIREZ-MENESES told

3 CS1 that he would call CS1 from his new number, and CS1 then received a call from

4 TT6.  CS1 sent a text to TT5 to confirm that the call was from RAMIREZ-MENESES

5 (aka "Cesar"), and RAMIREZ-MENESES confirmed it was him.  Telephone records

6 revealed the subscriber name and billing address for TT6 was the same as TT5 and TT2,

7 telephones previously used by RAMIREZ-MENESES.

8      25.     Later that same evening, at the direction of agents, CS1 called TT6.  The

9 telephone call occurred outside the presence of agents and was not recorded.  CS1

10 informed agents RAMIREZ-MENESES was the user of TT6, and RAMIREZ-MENESES

11 said he went to Mexico, and recently returned.  CS1 asked RAMIREZ MENESES if he

12 was still working, and what his prices were for "dark", referring to heroin.  RAMIREZ

13 MENESES stated that dark [heroin] would be $800 per piece [an ounce].  CS1 and

14 RAMIREZ MENESES discussed setting up a future narcotics transaction, and the

15 conversation ended shortly thereafter.

16 September 9, 2019 Continuation of Narcotics Communication on TT6

17      26.     On September 9, 2019, CS1 placed a recorded call to TT6 at the direction

18 of agents.  The following conversation occurred in Spanish and was translated to agents

19 by a Spanish-speaking interpreter contracted by DEA.

20          TT6:  Hello.

21          CS1:  Hello Cesar. How are you?

22          TT6:  Oh, what's up? How's it going?

23          CS1:  I'm good, I'm good. Um, can I talk to you?

24          TT6:  Yes, I'm just working right now.

25          CS1:  Okay, um, mm, I was going to ask you how much would you give me

26               a pound of, of, mm, water [methamphetamine]?

27          TT6:  How much did I give them to you the last time, two, four, right

28               [$2400 a pound]?

AFFIDAVIT OF KEVIN PALERMO - 9
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    CS1:  Yes, but that was a long time ago, and I did not know if it is the same

2    or, the thing is that somebody is asking me for one [one pound] and I

3    wanted to know how much should I sell it to them?

4    TT6:  At, at two, three [$2300 a pound].  Is that okay?  What do you think?

5    CS1: Two, three [$2300 a pound]?

6    TT6:  Uh-huh.

7    CS1:  Okay.  I will let you know in a little bit.

8    TT6:  Oh, good, let me, let...

9    [Voices overlap]

10    CS1:  Okay?

11    TT6: ...know

12    CS1:  Okay, thank you, Cesar.

13    TT6:  Alright, then, bye.

14    CS1:  Bye.

15    27.    Based on my training and experience and discussions with CS1, I believe

16 CS1 and RAMIREZ-MENESES using TT6 referred to methamphetamine as "water".

17 Furthermore, I believe when CS1 stated, "Yes, but that was a long time ago, and I did not

18 know if it is the same or, the thing is that somebody is asking me for one and I wanted to

19 know how much should I sell it to them?", CS1 asked RAMIREZ-MENESES how much

20 one pound of methamphetamine would cost.  When RAMIREZ-MENESES responded,

21 "At, at two (2), three (3)....", I believe he referred to the price for one pound of

22 methamphetamine as $2300.

23 <u>September 14, 2019, Surveillance of RAMIREZ-MENESES Returning from Oregon</u>

24    28.    On September 14, 2019, at approximately 6:00 a.m., GPS location data of a

25 telephone used by RAMIREZ-MENESES (TT6) indicated the telephone was in the

26 vicinity of the 11735 SE 225th Ct, Kent, Washington, RAMIREZ-MENESES' residence.

27 At approximately 6:11 a.m., agents observed a male believed to be RAMIREZ-

28

AFFIDAVIT OF KEVIN PALERMO - 10
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    MENESES, based on his physical appearance, enter the driver seat of a **silver Mazda**
2    parked in front of the residence, and the **silver Mazda** left shortly thereafter.

3         29.    Approximately four minutes later, at 6:15 a.m., GPS location data for the
4    telephone indicated TT6 was no longer in the vicinity of 11735 SE 225th Ct, Kent,
5    Washington, and reflected that the Mazda (based on agents' observations of Mazda's
6    location), and the telephone (based on GPS ping data) were at the same locations at the
7    same time, and therefore likely together.  Agents continued to monitor the GPS pings
8    which showed the telephone traveled to Salem, Oregon.  The telephone remained in
9    Salem, Oregon for approximately two hours before GPS data for TT6 indicated it was
10   traveling north on Interstate 5 towards Washington.

11        30.    Agents established physical surveillance in Washington, and with the
12   assistance of GPS location for RAMIREZ-MENESES' telephone, located the **silver**
13   **Mazda** travelling northbound on Interstate 5.  Agents confirmed RAMIREZ-MENESES
14   was the sole occupant of the Mazda at that time.  GPS data for the telephone and physical
15   observations of the Mazda indicated the telephone and the vehicle were traveling
16   together.

17        31.    Agents followed the Mazda to RAMIREZ-MENESES' residence located at
18   11735 SE 225th Ct, Kent, Washington, where they observed the Mazda idle in front of the
19   residence and an Hispanic male, believed to be DE LEON enter the front passenger seat.
20   Agents conducted surveillance of RAMIREZ-MENESES and DE LEON and watched the
21   two men visit a restaurant, a gas station, and then return to RAMIREZ-MENESES'
22   residence.  At this time, agents were unable to determine the purpose of RAMIREZ-
23   MENESES' trip to Salem, Oregon.

24   Intercepted Calls referencing RAMIREZ-MENESES

25        32.    On October 15, 16, 18 and 19, 2019, a Mexico-based telephone number 52-
26   664-761-4243, used by used by an unidentified male (hereinafter UI4243), was
27   intercepted over TT4 communicating with VILLASENOR.  The following text message
28   conversation occurred.

AFFIDAVIT OF KEVIN PALERMO - 11
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

<u>10/15/19</u>

    UI4243: Dude, you should come out so I can meet you.  I can send them up-there for you, but make the trip.

    UI4243: Also, with the slaves [heroin], I can give them to you at 18,500. [$18,500 a kilogram]

<u>10/16/19</u>

    TT4: I'm going to be honest dude, over here I get them at 1700 [$17,000] and on credit.  People up here don't want to pay.  If I get them at that [price], how much would I make?

    UI4243: I'll give them to you at 1700 [$17,000] over there.

    TT4: When are you going to be able, over there?

    UI4243: I'll let you know through Cesar [RAMIREZ-MENESES]

    TT4: Let me know to see how I'm doing with work [available narcotics] so I won't have that stopped.

    UI4243: Okay

<u>10/18/19</u>

    UI4243: Dude, how are you? Are you ready to get going?

33.    On October 18, 2019, 52-664-761-4273 attempted to call TT6 and the call was not answered.

<u>10/19/19</u>

    TT4: Dude really, I don't have any paper [money] right now.  I'm low on everything [narcotics and money], if you want to lend me five [front five kilograms of heroin], I'll get them.  But on the same note, I don't like to be pressured for the paper [money].

    TT4: You know sometimes it gets busy and then it slows down

    TT4: and right now, things are like this....

    TT4: ...slow.

    UI4243: Okay

AFFIDAVIT OF KEVIN PALERMO - 12
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1       TT4: Let me know if it's a yes so I don't get them over here.  Someone was
2       going to let me borrow some.
3       UI4243: Dude, could you ask Cesar [RAMIREZ-MENESES] to call me?
4       UI4243: To see if he can go/come down to get them.
5       UI4243: So he can go/come down.
6       TT4: Yes, let me call him [RAMIREZ-MENESES] to see if he answers.
7       UI4243: Okay so you can send him [RAMIREZ-MENESES] to get a
8       handful [narcotics], that way you have them handy over there.
9       UI4243: Did you call me, or did your buddy?
10      TT4: By accident...
11      TT4: ...sorry.
12      UI4243: Call me too
13      TT4: Let me finish eating breakfast...
14      TT4: I'll call you
15      UI4243: Okay, Cesar [RAMIREZ-MENESES] answered already.

16      34.    That same day a different Mexico telephone number, 52-664-731-9695

17  texted VILLASENOR on TT4.  Based on the conversation agents believe it is the same

18  user as 52-664-761-4273.

19      UI4243: Dude, save this number.  What did Cesar [RAMIREZ-MENESES]
20      tell you?
21      UI4243: Is he [RAMIREZ-MENESES] going to 'finish'
22      UI4243: Give him [RAMIREZ-MENESES] this number, please.

23      35.    I believe the above conversation is UI4243 coordinating a shipment of

24  narcotics to VILLASENOR.  In this specific instance, I believe slaves to be a reference to

25  heroin and the discussion of prices is consistent for a kilogram of heroin.  When the users

26  state 1700, I believe this is a typo or short hand for $17,000.  Furthermore, I believe

27  based on the conversation that RAMIREZ-MENESES was the individual who was to

28  facilitate or transport the narcotics being sent by UI4243 to VILLASENOR.  When

AFFIDAVIT OF KEVIN PALERMO - 13
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  UI4243 references "Cesar" I believe they are referring to RAMIREZ-MENESES, as his

2  first name is Cesar. Additionally, during the conversation UI4243 stated, "Okay, Cesar

3  [RAMIREZ-MENESES] answered already." Based on the above conversation, I believe

4  RAMIREZ-MENESES remains in contact with suspected sources of supply in Mexico

5  that share communications with VILLASENOR and is likely to be intercepted because of

6  those communications. Neither during, nor after, these conversations did

7  VILLASENOR, on either TT3 or TT4, contact any individuals believed to be

8  RAMIREZ-MENESES.

9  <u>October 30, 2019 Surveillance of VILLASENOR and the **silver Mazda**</u>

10        36.     On October 30, 2019, agents were conducting surveillance at

11  VILLASENOR's residence located at 18123 52nd Avenue, West, Lynnwood,

12  Washington. At approximately 8:17 p.m., agents observed a known vehicle used by

13  VILLASENOR arrive at the apartment complex. At approximately 8:321 p.m.

14  VILLASENOR (on **TT3**) received an incoming call from LEYVA-CASTELLANOS

15  using TT7 (Session 1186). LEYVA-CASTELLANOS asks, "Are you going deliver more

16  later tonight [make narcotics deliveries]?" VILLASENOR responds, Yes, I have, I have

17  right now... well, I am taking a shit right now. But I have four runs [deliveries of

18  narcotics] to do right now." VILLASENOR continues, "Hold on, maybe two or three

19  [deliveries].... hold on, I am reading a message from, from, from Julio, from Cesar

20  [RAMIREZ MENESES. (Aside: VILLASENOR reads: "give us another one and that's

21  it, aaaaanother one.") Yes, yes I will be over later tonight and will spend the night with

22  you." The conversation ends shortly thereafter. I believe VILLASENOR was telling

23  LEYVA-CASTELLANOS he needed to conduct several narcotics transaction that

24  evening. When VILLASENOR stated he was reading a message "from Julio, from

25  Cesar" I believe he is referring to RAMIREZ-MENESES.

26        37.     At approximately 8:52 p.m., agents observed a male, who appeared similar

27  in appearance to VILLASENOR exit the apartment 289. The male believed to be

28  VILLASENOR walked to a silver color passenger car that was idling in parking lot and

AFFIDAVIT OF KEVIN PALERMO - 14
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   entered the front passenger seat. Shortly thereafter agents observed the vehicle travel

2   down several streets making a large square at a low rate of speed, possibly conducting a

3   transaction inside the vehicle or counting counter surveillance. The registration of the

4   vehicle was identified as Washington registration BQN5917. The vehicle was identified

5   as the Mazda RAMIREZ-MENESES has been observed driving. At 9:02 p.m., agents

6   observed the Mazda return to VILLASENOR's apartment complex.

7       38.     At 9:11 p.m., agents observed a male similar in appearance to

8   VILLASENOR exit the apartment and enter the white Ford F150 truck, Washington

9   registration C04251J. Agents were unable to tell if VILLASENOR was in possession of

10  anything as he entered the vehicle. The Ford truck exited the apartment complex and

11  drove north. Agents conducted mobile surveillance on the Ford truck  At approximately

12  9:26 p.m., the Ford truck turned into Millwood Condos, located at16605 6 AVE W,

13  Lynnwood, WA 98037. Agents observed the ford truck park along the north fence line.

14  At about this same time agents observed a female, who appeared to be in her twenties,

15  walking in the direction of VILLASENOR's vehicle. Agents observed as the female at

16  the passenger's side of the truck. Agents were unable to tell if the female entered the

17  vehicle. Shortly thereafter agents saw lights come on Villasenor's truck. The female

18  then walked to unit G-203. At the door of G-203, agents observed enter the apartment,

19  but were uncertain if she accessed apartment on own or was let in.

20      39.     Based on the lack of intercepted phone calls, agents had no information

21  about VILLASENOR's activity between 2052 and 2212 hours. Based on surveillance

22  and his conversation with LEYVA-CASTELLANOS (Session 1186) telling her he had

23  "four runs to do then, maybe two or three," I believe VILLASENOR was conducting

24  drug transactions. One transaction was possibly was tied to the message VILLASENOR

25  partially read out loud to LEYVA-CASTELLANOS during this same call. The

26  referenced communications with RAMIREZ-MENESES was not intercepted on TT3,

27  TT4 or TT6.

28

AFFIDAVIT OF KEVIN PALERMO - 15
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  November 10, 2019, Message on TT6

2      40.    On November 10, 2019, agents received a text message on TT6 (Session

3  66). The Text Message stated: "Welcome to Mexico Roaming! If the Mexico roaming

4  feature you selected has limits for minutes, texts and/or data we will alert you when you

5  get to 80% usage. Details at metrobyt-mobile.com. Thank you, Metro by T-Mobile."

6  November 13, 2019, seizure of the **silver Mazda**

7      41.    On November 13, 2019, remote surveillance of the residence located at

8  11753 SE 225th Court, Kent, WA, showed the silver Mazda parked in front of the

9  residence. Later that same day a male, later identified to be Julio Cesar RAMIREZ-

10  MENESES, based on a Mexican passport provided to law enforcement.  Investigators

11  observed RAMIREZ-MENESES with a box near the trunk of the **silver Mazda**

12  (BQN5917).  As stated during the May, 4, 2019, controlled purchases, agents know

13  RAMIREZ-MENESES to conceal narcotics in boxes. Agents observed the Mazda

14  (BQN5917) depart the residence.  Due to technical limitations, remote observations

15  ceased.  Investigators previously positioned in the vicinity, however, conducted physical

16  surveillance on RAMIREZ-MENESES and the **silver Mazda**.

17      42.    At approximately 2:31 p.m., investigators followed the **silver Mazda** until

18  it parked in the vicinity of Saigon Soul Vietnamese Restaurant located at 24202 104th

19  Avenue SE, Kent, Washington.  At approximately 3:17 p.m., agents observed

20  RAMIREZ-MENSES exit the Saigon Soul Vietnamese Restaurant and enter the driver's

21  side of the **silver Mazda**.  Shortly thereafter, agents directed a marked police unit to

22  contact RAMIREZ-MENESES, in the **silver Mazda**, while it was parked in the public

23  parking lot. RAMIREZ-MENESES was informed he was under investigation for

24  narcotics violations, RAMIREZ-MENESES responded by stating he had previously

25  worked with law enforcement before and wants to help the current investigators.

26      43.    Investigators searched RAMIREZ-MENESES before placing him in the

27  marked patrol unit to speak with him, during that time investigators located

28  approximately one ounce of methamphetamine in RAMIREZ-MENESES' front right

AFFIDAVIT OF KEVIN PALERMO - 16
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  pocket. During the time officers were speaking to RAMIREZ-MENESES, agents directed

2  Tukwila Detective, Jamie Sturgile[5] to apply a narcotics detecting dog ("K9" "Apollo") to

3  the **silver Mazda**. Upon performing the K9 "sniff", the K9 gave a positive indication for

4  the presence of narcotics odor at the driver's door. RAMIREZ-MENESES gave consent

5  to agents to search the **silver Mazda,** another vehicle he owned, and his residences.

6  Investigators conducted a search of the vehicle, but did not located readily accessible

7  contraband. Investigators transported and impounded the vehicle at a secured Seattle

8  Police Department facility for a more thorough search.

9  <u>Intercepted phone conversations following seizure of the Mazda</u>

10      44.    On November 13, 2019, agents intercepted an incoming phone call over

11  TT4, used by VILLASENOR, from telephone number 52-664-731-9695, the same

12  individual (UI4243) who texted VILLASENOR in mid-October. VILLASENOR did not

13  answer the phone, however, the UM's aside conversation to an unknown female,

14  hereinafter UF, was intercepted while TT4's voicemail message recorded. The following

15  is the conversation which occurred

| | | |
|---|---|---|
| 16 | TT4 | Recording – Please leave your message for four (4), two (2), |
| 17 | | five (5), four (4), one (1), zero (0), six (6), nine (9), six (6), |
| 18 | | two (2). [Background: Telephone beeps] |
| 19 | UI4243 | The car [U/I] did not find it [Audio glitch].] |
| 20 | UF | [U/I] |
| 21 | UI4243 | No. But these fuckers [law enforcement] took the car from |
| 22 | | him [RAMIREZ-MENESES]. Son of a bitch! |
| 23 | UF | [U/I] |
| 24 | UI4243 | The ones hidden in the car [narcotics hidden in the **silver** |
| 25 | | **Mazda**], they didn't find, but it's a matter of time that they'll |
| 26 | | find them. They took the car away from him. |

27

---

28  [5] I have attached Detective Sturgile's affidavit detailing the event, to include his training and experience and canine
qualifications, to this affidavit.

AFFIDAVIT OF KEVIN PALERMO - 17
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| | | |
|---|---|---|
| 1 | UF     [U/I] | |
| 2 | UI4243 | First, they brought the dog out [law enforcement K9] and |
| 3 | | nothing. He [RAMIREZ-MENESES] says they didn't find |
| 4 | | anything on him. |
| 5 | UF | Did they take him to jail? |
| 6 | UI4243 | He [RAMIREZ-MENESES] says first they brought the dog, |
| 7 | | and nothing. Then, two guys checked him, and nothing. He |
| 8 | | says that, that they told him they'd be back tomorrow for him. |

45.     Based on the these events, I believe RAMIREZ-MENESES was utilizing the Mazda to transport narcotics.  I believe the UM was attempting to contact VILLASENOR to obtain further information from VILLASENOR, or to inform VILLASENOR of RAMIREZ MENESES' encounter with law enforcement. The aside intercepted conversation recounted law enforcements contact with RAMIREZ-MENESES in detail, specifically citing the K9 application on the **silver Mazda** and the number of officers used to physically search the vehicle. It is unlikely an onlooker recounted the details to the UM, leading me to believe RAMIREZ-MENESES recounted the details himself.  Furthermore, I believe the UM was stating that law enforcement did not locate the narcotics in the **silver Mazda** because the narcotics are hidden.  I know narcotics traffickers to use hidden compartments, commonly known as "traps", to conceal narcotics and proceeds from law enforcement and others looking to steal their product or illicit gains.

## CONCLUSION

46.     For the reasons set forth above, I respectfully submit there is probable cause to believe that evidence of the crime of conspiracy to distribute controlled substances, as described in Attachment B, will be found at the subject location described in attachment A, and ask that a warrant be issued to search the subject premises for said evidence.

AFFIDAVIT OF KEVIN PALERMO - 18
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## KNOWLEDGE BASED ON TRAINING AND EXPERIENCE

47.     Based on my training and experience, and my discussions with other experienced officers and agents involved in drug investigations, I know the following:

a.     Traffickers of controlled substances, and those who assist them, maintain and tend to retain accounts or records of their drug trafficking activities, including lists of drug quantities and money owed, telephone records including contact names and numbers, photographs, and similar records of evidentiary value. These items are generally kept in locations where drug traffickers believe their property is secure and will remain undetected from law enforcement, such as inside their homes, vehicles and storage lockers.

b.     Traffickers of controlled substances commonly maintain addresses, vehicles, or telephone numbers which reflect names, addresses, vehicles, and/or telephone numbers of their suppliers, customers and associates in the trafficking organization and it is common to find drug traffickers keeping records of said associates in cellular telephones and other electronic devices. Traffickers almost always maintain cellular telephones for ready access to their clientele and to maintain their ongoing narcotics business.

c.     Traffickers maintain evidence of their criminal activity at locations that are convenient to them, including their residences, vehicles, and storage lockers. This evidence often includes more than contraband and paraphernalia and includes financial records, records of property and vehicle ownership, records of property rented, records of post office boxes used to ship and receive contraband and currency, records of other storage facilities used to hide drugs or currency, and other documentary evidence relating to commission of, and proceeds from, their crimes.

d.     During the execution of search warrants, it is common to find papers, letters, billings, documents, and other writings which show ownership, dominion, and control of vehicles, residences, and/or storage units.

AFFIDAVIT OF KEVIN PALERMO - 19
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1        e.      Persons trafficking and using controlled substances commonly sell

2   or use more than one type of controlled substance at any one time.

3        f.      Traffickers frequently maintain items necessary for weighing,

4   packaging, and cutting drugs for distribution.  This paraphernalia often includes, but is

5   not limited to, scales, plastic bags, and cutting/diluting agents and items to mask the odor

6   of drugs

7        g.      Traffickers often maintain weapons, including guns and ammunition,

8   in secure locations such as their residences and vehicles and storage lockers, in order to

9   protect their drugs and drug proceeds.

10       h.      Traffickers often have false identification documents and

11   identification documents in the names of others.

12       i.      Drug trafficking is a cash business, and in order to escape notice

13   from authorities for using unexplained income, or hide excessive cash from illegal

14   activities, traffickers either keep large quantities of cash at home or other secure locations

15   such as a storage locker, or convert the cash into other valuable assets, such as jewelry,

16   precious metals, monetary instruments, or other negotiable forms of wealth.  Records of

17   such conversions are often stored where a trafficker lives.

18      48.     As noted above, drug dealers use cellular telephones as a tool or

19   instrumentality in committing their criminal activity.  They use them to maintain contact

20   with their suppliers, distributors, and customers.  They prefer cellular telephones because,

21   first they can be purchased without the location and personal information that land lines

22   require.  Second, they can be easily carried to permit the user maximum flexibility in

23   meeting associates, avoiding police surveillance, and traveling to obtain or distribute

24   drugs.  Third, they can be passed between members of a drug conspiracy to allow

25   substitution when one member leaves the area temporarily.  Since cellular phone use

26   became widespread, every drug dealer I have contacted has used one or more cellular

27   telephone for his or her drug business.  I also know that it is common for drug traffickers

28   to retain in their possession phones that they previously used, but have discontinued

AFFIDAVIT OF KEVIN PALERMO - 20
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  actively using, for their drug trafficking business. Based on my training and experience,
2  the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or
3  crimes. This includes the following:

4       a.   The assigned number to the cellular telephone (known as the mobile
5  directory number or MDN), and the identifying telephone serial number (Electronic
6  Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile
7  Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are
8  important evidence because they reveal the service provider, allow us to obtain subscriber
9  information, and uniquely identify the telephone. This information can be used to obtain
10  toll records, to identify contacts by this telephone with other cellular telephones used by
11  co-conspirators, to identify other telephones used by the same subscriber or purchased as
12  a part of a package, and to confirm if the telephone was contacted by a cooperating
13  source or was intercepted on a wiretap here or in another district.

14       b.   The stored list of recent received calls and send calls in important
15  evidence. It identifies telephones recently in contact with the telephone user. This is
16  valuable information in a drug investigation because it will identify telephones used by
17  other members of the organization, such as suppliers, distributors and customers, and it
18  confirms the date and time of contacts. If the user is under surveillance, it identifies what
19  number he called during or around the time of a drug transaction or surveilled meeting.
20  Even if a contact involves a telephone user not part of the conspiracy, the information is
21  helpful (and thus is evidence) because if leads to friends and associates of the user who
22  can identify the user, help locate the user, and provide information about the user.
23  Identifying a defendant's law-abiding friends is often just as useful as identifying his
24  drug trafficking associates.

25       c.   Stored text messages are important evidence, similar to stored
26  numbers. Agents can identify both drug associates, and friends of the user who likely
27  have helpful information about the user, his location, and his activities.

28

AFFIDAVIT OF KEVIN PALERMO - 21
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1          d.      Photographs on a cellular telephone are evidence because they help

2 identify the user, either through his or her own picture, or through pictures of friends,

3 family, and associates that can identify the user. Pictures also identify associates likely to

4 be members of the DTO. Some drug dealers photograph groups of associates, sometimes

5 posing with weapons and showing identifiable gang signs.

6          e.      Stored address records are important evidence because they show the

7 user's close associates and family members, and they contain names and nicknames

8 connected to phone numbers that can be used to identify suspects.

9                 **REQUEST FOR SEALING AND DELAYED NOTICE**

10      49.      The investigation remains ongoing, including the use of a wiretap. The

11 wiretap application authorizes interception for up to 30 days, and is expected to last at

12 least until November 14, 2019. However, investigators are seeking to renew interception

13 on two of of the target telephones and/or to "spin" to intercept four newly identified

14 target telephones. Based on information provided by sources of information and other

15 law enforcement personnel, I believe that the investigation will ultimately lead us to other

16 jurisdictions. I also believe that the investigation will ultimately lead us to numerous

17 other individuals involved in narcotics trafficking. Accordingly, the investigation will

18 most assuredly last more than 90 days. Delayed notification is justified because there is

19 reasonable cause to believe that premature disclosure of this Application will may have

20 an adverse result, as defined in 18 U.S.C. § 2705, including risking the safety of

21 informants, causing flight from prosecution or destruction of evidence, and seriously

22 jeopardizing the investigation by giving the person notified an opportunity to destroy

23 evidence, change patterns of behavior, advise confederates, and flee from prosecution.

24 *See* 18 U.S.C. § 3103a(b)(1). Finally, there is reasonable necessity for the use of the

25 technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

26 I therefore request delayed notice until January 29, 2019 (90 days past the end of the

27 tracking period), pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal

28 Procedure 41(f)(3), with leave to request further delays on good cause shown.

AFFIDAVIT OF KEVIN PALERMO - 22
USAO 2019R00179

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

50.    I further request permission to execute this search warrant at any time of the day or night.

51.    In light of the ongoing matter pertaining to the investigation of the JIMENEZ-HERNANDEZ TCO to include the use of Title III intercepts, and to avoid any premature disclosure of the existence of the above-described investigation to anyone who may generally view the files of the clerk of the United States District Court for the Western District of Washington, with the result and risk that the investigation may be compromised, it is requested that this Affidavit, accompanying Application, and Warrant, be sealed until further Order of this Court.

Kevin Palermo
Special Agent
Drug Enforcement Administration

The above-named agent provided a sworn statement attesting to the truth of the contents of the foregoing affidavit on the __14__ day of November, 2019.

THE HONORABLE JOHN L. WEINBERG
United States Magistrate Judge

AFFIDAVIT OF KEVIN PALERMO - 23
USAO 2019R00179

# Tukwila Police Department
## Anti-Crime Team K-9

Detective James Sturgill
November 13, 2019

---

**DETAILS**

On November 13, 2019 at approx. 1500 hours, I, Tukwila Police Detective J. Sturgill assisted Seattle PD Detectives with a K-9 sniff of the exterior of a vehicle located at 24202 104th Ave SE in Kent. Upon arrival, I contacted SPD Detectives who pointed out the suspicious vehicle parked in the parking lot. I noticed that the suspicious vehicle (WA plate BQN5917) was unoccupied and the driver side front door was open. At approx. 1535 hours, I then deployed my canine partner "Apollo" and we started searching the exterior of the suspicious vehicle in a systematic manner. While searching, Apollo had a change of behavior and slowed his search as his sniffed around the opening of the driver's door (Apollo never entered the vehicle). Apollo took several deep breaths and sat. When Apollo sits, it's an indication to me that he could smell the odor of narcotics coming from inside the vehicle. I rewarded Apollo with a rubber ball.

This concludes my involvement in the case.


**OFFICERS TRAINING/EXPERIENCE**

I, James Sturgill have been a commissioned law enforcement officer for the past sixteen years. I am employed by the City of Tukwila and have recently been assigned to the Tukwila Anti-Crime Team; I am currently the K-9 Narcotic's Detective assigned to that unit. During my career, I have investigated several narcotics-related crimes in and around the City of Tukwila.

My current duties include investigating federal and state narcotics violations within the jurisdiction of the County of King, the State of Washington, and the United States.

During my career, I have received extensive training to include: 720 hours at the Washington State Criminal Justice Training Center's Basic Law Enforcement Academy. This training includes numerous hours of instruction on Criminal Law, Property Crimes, Crimes against Persons, basic report writing, Narcotics Investigations and recognition (including the recognition of marijuana, cocaine, heroin and methamphetamine). I have received further training to assist me with narcotics investigations and arrests. In 2006, I received 48 hours of Gang Investigation and Street Crimes training. These courses included gang and narcotic recognition, buy bust operations, surveillance and interview techniques, how narcotics are transported and where narcotics can be hidden in vehicle's, homes, and in humans. In 2013, I received 24 hours of similar training by attending Gangs in the Northwest and Street Survival. I also attended How to Manage a CI in 2013. This course focused on how to interview suspects of narcotics related offenses and how to turn that person into a confidential informant. This course included interview techniques and basic search warrant preparation and service. In 2014, 2015 and 2018, I received nationally recognized narcotics training provided by California Narcotics Officers Association (CNOA). In 2014, 2015 and 2018 I received nationally recognized narcotics training provided by Washington State Narcotics Investigators Association (WSNIA). Both CNOA and WSNIA are 4-day classroom courses

containing numerous narcotic related classes. In 2015 and 2018, I attended Operation Jetway Interdiction training. This 32-hour classroom course is conducted by EPIC/DEA and focuses on the many ways that police officers can interdict drugs and drug proceeds from DTO's. In 2017 and 2019, I received 32 hours of classroom interdiction training with the nationally recognized International Narcotics Interdiction Association (INIA). In 2016, I completed the 200-hour Washington State Narcotic's Canine Course. During the 6-week course, my canine partner "Apollo" was trained to identify and alert on the odors of Cocaine, Heroin, Methamphetamine and Marijuana. During the early part of my career, I worked numerous cases with the Tukwila Anti-Crime (TAC) Team, working as a uniformed take down officer. I assisted the TAC Team with several buy walks and buy busts during my career. I also personally investigated numerous VUCSA cases while working as a patrol officer in the City of Tukwila.

By virtue of my assignment with the TAC Team, I am authorized to conduct investigations into violations of the Controlled Substances Act. In doing so, I have conducted a variety of investigations into violations ranging from simple possession of narcotics to the sales of narcotics. Because of this experience and training, I am familiar with common methods of investigating drug trafficking and have become familiar with the methods of operation of drug traffickers, their use of cellular telephones, telephone pagers, emails, and other electronic means of communication to further their narcotics trafficking activities; and their use of numerical codes, code words, counter-surveillance, and other methods of avoiding detection by law enforcement. I am also familiar with the various methods of packaging, delivering, transferring, and laundering.

I have participated in the execution of narcotics search warrants. Most commonly, these warrants authorize the search of locations ranging from the residences of drug traffickers and their coconspirator/associates, to locations used to manufacture, distribute and hide narcotics and drug proceeds. Materials searched for and often recovered in these locations include packaging materials, manufacturing items, scales, weapons, documents and papers reflecting the distribution of controlled substances and the identity of coconspirator associates, and papers evidencing the receipt, investment, and concealment of proceeds derived from the distribution of controlled substances.


**CANINE QUALIFICATIONS**

I'm currently assigned to the Tukwila Anti-Crime Team and handle a narcotics canine as a collateral duty. In November 2016, I completed the state mandated requirement of 200 hours of canine narcotics specific training and met the canine performance standards set by the Washington Administrative Code (W.A.C.) 139-05-915 for the Narcotic Dog Handler (General Detection).

On November 13, 2016 Canine "Apollo" and I were certified as a team by the Washington State Police Canine Association. We recertified on January 8th, 2019 in Bothell, WA. The WSPCA is an organization with voluntary membership to improve training and effectiveness of canine teams statewide. The WSPCA certification is also voluntary with more stringent standards than the state requirement. The substances trained on by the team are cocaine, heroin, methamphetamine and marijuana.

Apollo is a passive alert canine and he is trained to give a "sit response" after having located the specific location the narcotics odor is emitting from. The handler is trained to recognize the changes of behavior the canine exhibits when it begins to detect the odor of narcotics. The odor can be emitting from the controlled substance itself, or it can be absorbed into items such as currency, clothing, containers, packaging material, etc. Narcotic smelling canines such as "Apollo" have an inherently keen sense of smell and will continue to alert on the container or item depending on the length of exposure to the

controlled substance, and the amount of ventilation the item is exposed to.

Apollo's reward for finding narcotics / narcotic related items is a rubber ball or leather strap.  Apollo and I continue to train on a regular basis to maintain our proficiency as a team.
On-going training includes or will include:
- Training in all areas of interdiction, such as vehicles, boats, truck tractor and trailers, schools, currency, parcels and mail, airports and airplanes, bus and bus depots, storage units, residences, trains and train depots, prisons, motels, apartments, etc.
- Training on various quantities of controlled substances, ranging from grams to ounces, and pounds when available.
- Training on novel odors, such as odors that are distracting, masking, or new.
- Training on controlled negative (blank) testing, in which all objects or locations have no contraband present
- Training in "Double Blind" scenarios
- Extinction training, which proofs the dog and prevents him from alerting to common items associated with controlled substances, such as plastic bags, etc.

I maintain both training logs and field activity/application reports.  Both are available for review upon request.  At this time the team has found over 1000 narcotics substance training aids and 140 applications in the field resulting in the seizure of narcotics and currency.

Canine Apollo is trained to detect the presence of marijuana, heroin, methamphetamine, and cocaine. Canine Apollo cannot communicate which of these substances he has detected. Canine Apollo can detect minuscule amounts of these four substances. Canine Apollo cannot communicate whether the detected substance is present as residue or in measurable amounts. Despite these limitations, canine Apollo's alert provides probable cause to believe that evidence of a Violation of a Uniform Controlled Substance Act may be found where the canine provides a positive alert for the odor of controlled substances.

I certify or swear under the penalty of perjury the foregoing statement is true and correct.

Detective James C. Sturgill
Tukwila Police TAC Team
Badge #151